## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PIERRE & CARLO, INC., et al., | : | |
| Plaintiffs | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 09-5010 |
| PREMIER SALONS, INC., et al., | : | |
| Defendants | : | |

**May _24__ , 2010**                                    **Anita B. Brody, J.**

### MEMORANDUM[1]

## I. FACTS[2]

_____For more than 30 years, Plaintiff Pierre & Carlo operated one of the top salons and spas

in Philadelphia in leased premises at The Bellevue, 200 S. Broad Street, Philadelphia (the

"Premises").  During that time, Plaintiff Joseph Cutrufello, the owner, president, and manager of

Pierre & Carlo,[3] worked tirelessly to develop Pierre & Carlo's reputation and expand its clientele.

---

[1] Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367.

[2] All facts in this Memorandum are my Findings of Fact after considering testimony at a January 19-20, 2010 evidentiary hearing and documentary evidence submitted by the parties.  The transcript of the January 19, 2010 evidentiary hearing is cited as "TR19."  The transcript of the January 20, 2010 evidentiary hearing is cited as "TR20."  Where applicable, evidence admitted at the January 19-20 hearing is cited by reference to its exhibit number in Pierre & Carlo's January 15, 2010 Reply in Support of its Motion for a Preliminary Injunction (Doc. # 25).  For example, Exhibit A to Pierre & Carlo's Reply in Support of its Motion for a Preliminary Injunction is cited simply as "Ex. A."

[3] Although both Pierre & Carlo and Cutrufello are plaintiffs in this action, the motion for a preliminary injunction was filed only on behalf of Pierre & Carlo.  Thus, for purposes of this Memorandum, "Plaintiff" refers only to Pierre & Carlo.

Pierre & Carlo spent more than a million dollars advertising its name (TR20 at 99-101) and devoted considerable resources to train its employees. It took "many years" and "a lot of time, energy, and investment" to educate Pierre & Carlo employees and build customer loyalty. (TR20 at 124.)

On October 23, 2009, Pierre & Carlo's long history at The Bellevue came to a sudden halt. By cooperating with Defendant Premier Salons, The Bellevue ousted Pierre & Carlo from the Premises and allowed Premier to change the locks, in violation of a lease agreement that allowed Pierre & Carlo to occupy the Premises through June 30, 2015. (TR20 at 102, 142-43.) On that same day, Premier seized Pierre & Carlo's business; Premier immediately put Pierre & Carlo employees to work servicing Pierre & Carlo customers.

Unbeknownst to Pierre & Carlo, The Bellevue and Premier had been scheming about the takeover for months. Jocelyne Horst, Premier's Senior Vice President, assisted because she apparently had prior experience with similar takeovers; even she thought it was "[s]ad that I have this down to science." (Ex. L.) To secure Cutrufello's cooperation, Horst instructed Premier employees to "dangle the potential of a position" in front of him. Id. Premier employees followed through on that request.

On October 21, 2009, Premier instructed The Bellevue's management to tell Cutrufello that Premier was "interested in speaking to him about employment options." (TR19 at 153-56.) Later that day, Premier offered Cutrufello a job at the salon working for Premier. (TR20 at 131-32.) Premier also asked Cutrufello to "let the staff know that . . . he was going to be staying" in order "to give the staff comfort." (TR20 at 56-57.) Relying on Premier's representations, Cutrufello complied with its requests.

2

On October 23, 2009, Cutrufello went into the salon under the impression that he had employment with Premier. (TR20 at 135.) Instead, Premier rescinded its job offer and ordered Cutrufello to leave the Premises. (TR20 at 76-78, 139-40.) Cutrufello left, believing that he would be ejected by security if he failed to comply with Premier's demand. (TR20 at 145.)

From October 23, 2009 onward, Premier operated the salon for its own profit. Premier immediately began servicing Pierre & Carlo customers, many of whom booked their appointments with Pierre & Carlo prior to the takeover (TR19 at 78-79), by using Pierre & Carlo's name, license, equipment and furniture, employees, and customer lists, as follows:[4]

- <u>Name:</u> Through November 1, 2009, Premier displayed Pierre & Carlo signage, offered Pierre & Carlo branded products for sale, wore aprons with the Pierre & Carlo logo, issued customer receipts bearing the Pierre & Carlo logo, and distributed business cards with the Pierre & Carlo phone number. (Ex. CC.) Premier personnel who called customers said that they were calling from Pierre & Carlo. <u>Id.</u> Additionally, Premier accepted Pierre & Carlo gift certificates through December 31, 2009. (TR20 at 38-39.)

- <u>License:</u> Premier currently operates in the Premises pursuant to a license issued by the State Board of Cosmetology (the "State Board"). To get this license, Premier supplied Pierre & Carlo's telephone and license numbers and represented that there had been a "change in ownership" in the salon at The Bellevue. (Ex. R.) By misrepresenting the takeover as a change in ownership rather than identifying the opening of a "new salon," Premier was able to take advantage of a 90 day grace period that allowed it to open for business on October 23, 2009 without an inspection. (<u>See</u> Exs. T, U.) Premier's statement that there had been a "change of ownership" also prevented Pierre & Carlo from benefitting from a 90 day grace period that would allow it to transfer its existing license to a different location. (<u>See</u> Pl.'s Feb. 19, 2010 Findings of Fact, Doc. # 34, Ex. 8.)

_____

[4] Premier also attempted to seize the Pierre & Carlo phone number. On October 23, 2009, Snow Proudlove, Premier's Vice President of Operations, emailed Premier staff that "[t]he prior owners wife has threatened to disconnect the phone." (Ex. Z.) Proudlove noted that "[t]his would be a disaster that would kill the existing business" and asked for their help to "get this account changed into our name as we would like to keep the same phone #'s." <u>Id.</u> Premier's attempts to obtain the Pierre & Carlo phone number ultimately failed. (<u>See</u> TR19 at 121.)

- Equipment and Furniture: Pierre & Carlo retains title to virtually all of the equipment that Premier uses to service customers.[5] (TR19 at 128-29.) In contrast, Premier has never paid Pierre & Carlo, or anyone else, for its continued use of the equipment. (TR19 at 160-65.)[6]

- Employees: Premier hired the former Pierre & Carlo employees[7] and required that they sign non-compete, non-solicitation of customers, and confidentiality agreements. (TR19 at 57-59; Ex. Y.)[8] Premier also offered signing bonuses to employees who had previously worked for Pierre & Carlo, but required that employees agree to return the bonus if they leave Premier's employ within one year. (TR19 at 57-59, 120-121.)

- Customer lists: The newly-minted Premier employees used customer contact information from client lists that they developed and maintained when they worked for Pierre & Carlo. (TR19 at 123.) Pierre & Carlo's Policies & Procedures Manual prohibited such use, treating customer information as confidential salon property:

  > Salon records such as perm cards, color cards, names, addresses and phone numbers of clients are the property of Pierre and Carlo, Inc. Any such records are for Salon use and for performance of such services. These records are not to be removed from the Salon.

---

[5] This equipment includes: hydraulic tables for massages and facials (TR19 at 70-73; TR20 at 109); work stations for providing hair services, each of which is equipped with a hydraulic chair, blowdryers, and scissors (TR19 at 126-27; TR20 at 108-09); and sofas, chairs, and a flat screen television in the reception area (TR19 at 74). Although some of the equipment is leased, Pierre & Carlo retains an option to purchase the leased equipment at the end of the lease term. (TR19 at 51-52.)

[6] When The Bellevue enticed Premier to open a spa in the Premises, it promised Premier that "all existing furniture, fixtures and equipment" present in the salon space would become Premier's property, without regard to whether The Bellevue actually had title to the property. (Ex. J.)

[7] Before it was ousted from the Premises, Pierre & Carlo employed approximately 35 employees, including 18 stylists, 4 assistants, 4 massage therapists, 4 aestheticians, 2 nail technicians, 2 receptionists, and a cleaning staff. (TR20 at 106.) Many of Pierre & Carlo's employees had longstanding relationships with the salon. (TR19 at 54, 102, 112. See also TR20 at 107.)

[8] The overwhelming majority of employees signed the agreements. (TR20 at 28.)

4

(TR20 at 270-71.)  Pierre & Carlo also prohibited its employees from selling client information to third parties.  (TR20 at 124-25.)

Premier's takeover of Pierre & Carlo's business prevented Pierre & Carlo from continuing operations at The Bellevue and interfered with its ability to open a new salon in a different location.  Although Pierre & Carlo was in debt on October 23, it was taking steps to improve its profitability by increasing sales and reducing overhead.  (TR20 at 120-22.)  Pierre & Carlo was also engaged in discussions with a potential business partner who was confident that he could run a profitable salon at The Bellevue.  (TR20 at 121-22.)

Absent Premier's intrusion, Pierre & Carlo could have opened a new salon and spa in a different location or brought its name and clientele to another high-end salon in the Philadelphia area.  (TR20 at 123-24, 153-54.)  Premier's actions, however, destroyed Pierre & Carlo's ability to relocate:  Cutrufello clearly testified that Pierre & Carlo is unable to open a new salon without its equipment and that if it were able to reacquire the furniture and inventory, it would help reestablish the business.  (TR20 at 110-11, 277-81.)[9]  I find Cutrufello's testimony that, if granted appropriate relief, he will attempt to open a new Pierre & Carlo salon entirely credible.  I also find that because of the name recognition and branding associated with the Pierre & Carlo

_____

[9] At a December 17, 2009 deposition, Cutrufello testified that if Premier were willing to return the furniture, fixtures, and personal property that was in the salon on October 23, 2009, he would "probably sell it" for approximately $15,000 to $20,000.  (TR20 at 242-43.)  At the January 19-20 hearing, however, Cutrufello clarified that his decision regarding what to do with the property would depend on what other relief he obtained (i.e., his license, restrictions on using the Pierre & Carlo name, etc.).  (TR20 at 245, 277-78.)  I find Cutrufello's testimony that the equipment is essential to opening a new salon and that, if he obtained it, he would try to open a new Pierre & Carlo location entirely credible.

name, Cutrufello's efforts to open a salon, either alone or with a business partner, are likely to succeed.  (See TR20 at 120-22.)[10]

On October 30, 2009, Plaintiffs filed this action in an attempt to prevent Premier from further sabotaging its business.  On November 4, 2009, Pierre & Carlo filed a motion for a preliminary injunction, asking that I enjoin Premier from (i) directly or indirectly operating a beauty salon and/or day spa at The Bellevue, (ii) using the name Pierre & Carlo or any derivation thereof, or (iii) otherwise using in any form or fashion the good will or other assets of Plaintiffs. On November 10, 2009, I held a telephone conference with the parties.  At this conference, Premier assured the Court that it would refrain from using the name Pierre & Carlo.  On November 12, 2009, consistent with that representation, I issued an order preliminarily enjoining and restraining Premier from using the Pierre & Carlo name.

Premier, however, failed to inform its employees about the Court order.  (TR19 at 89-90, 115; TR20 at 44.)[11]  As a result, in November 2009, Premier employees mailed letters prepared

---

[10] Premier's continued use of the customer lists, however, has no impact on Pierre & Carlo's ability to open a new salon.  On January 20, 2010, Cutrufello testified that he has no specific objection to Premier's use of the customer lists:

> Q:    Do you have any objection to the – to the Premier operators servicing
>        clients that they serviced while they were employees of Pierre and Carlo,
>        yes or no?
> A:    Not now.
> Q:    Okay.  Do you have any objection to them calling those customers?
> A:    Not now, no.

(TR20 at 234.)

[11] Premier also failed to instruct its employees to preserve evidence related to this action.  (TR19 at 85-86, 91-92.)

by Premier's marketing division to Pierre & Carlo customers that clearly use the Pierre & Carlo name.  (See TR20 at 43.)[12]

Not content to simply use Pierre & Carlo's license, equipment, employees, and customer lists, Premier also attempted to usurp Pierre & Carlo's hard earned reputation.  The first letter, sent in early November, emphasized Pierre & Carlo's tradition of providing high quality salon and spa services:

> Halcyon Days Salon & Spa opened for business on October 23 in the space previously known as Pierre & Carlo Salon and Spa, to carry on the legacy of one of Philadelphia's top beauty destinations.  Guests can expect the same great service and staff, while experiencing a renewed commitment to quality and luxury with support from the location's new operator.
>
> . . .
>
> With Pierre and Carlo's 30-year history at The Bellevue, and a clientele that includes government and business dignitaries, high-society brides and celebrities, becoming a part of the Halcyon Days network will take this formerly family-run business to the next level.

(Ex. AA.)  On November 29, 2009, Premier employees mailed a similar letter, again stating that Premier intended to "carry on the legacy" of Pierre & Carlo.  (Ex. FF.)  In addition to interfering with Pierre & Carlo's ability to open a new salon, Premier's attempts to capitalize on Pierre & Carlo's reputation and good will inhibit Pierre & Carlo's ability to collect licensing fees for the use of its name.  Pierre & Carlo currently collects such licensing fees from a salon and spa located in Wyncote, Pennsylvania.  (TR20 at 218-19.)

---

[12] Premier provided employees with the letters, envelopes to send them in, and reimbursed employees for postage.  (TR19 at 90, 123-24.)

## II. DISCUSSION

Pierre & Carlo requests the following injunctive relief:

1.    Defendant is directed to immediately withdraw the Salon Licensure Application filed with the State Board of Cosmetology at Application Number 2744490.

2.    Defendant is directed to immediately cease and desist from operating under Salon License No. CB122284 and to surrender said License to The State Board of Cosmetology.

3.    Defendant is direct to immediately notify the State Board in writing of the following fraudulent misrepresentations made in its application and cover letter:
      a.    Salon Telephone Number 215-790-9910 is not and has never been a number legitimately associated with or owned by Defendant.
      b.    Defendant never held or possessed a Salon License No. CB088972L.
      c.    There was no "Change of ownership" associated with Salon License No. CB088972L.
      d.    Defendant does not lawfully possess or own the minimum equipment required for licensure at the location of the applicant.
      e.    The following statement was a misrepresentation: "The business has changed ownership, unfortunately the previous owner has refused to co-operate with Trade Secret Beauty Stores, Inc. in this change over period."[13]

4.    Defendant shall immediately cease and desist from operating within The Bellevue.

5.    Defendant shall immediately surrender the original and all copies of customer information relating to any and all customers who patronized Pierre & Carlo on and prior to October 23, 2009.

6.    Defendant shall immediately notify all former employees of Pierre & Carlo now employed by Defendant that they are excused from any obligations or burdens imposed under the Personnel Status forms, the Employment Agreements and the Sign On Bonus Agreements.

7.    Defendant shall immediately cease and desist from using any and all furniture, fixture, and equipment present in the salon on October 23, 2009.

8.    Defendant shall immediately cease and desist from providing any service to customers who patronized Pierre & Carlo on and prior to October 23, 2009.

---

[13] "Trade Secret Beauty Stores" is a corporate name used by Premier and Halcyon.

9.      Defendant shall immediately notify in writing all customers of Pierre & Carlo prior to October 23, 2009, that the statements made in the letters mailed on or about November 20, 2009 are false and fraudulent and that there has never been any legitimate association between Pierre & Carlo and Halcyon Days Salon & Spa.

10.     Defense counsel shall certify to the Court within 10 days of the entry of the Court's Order that Defendant has fully complied with each and every term stated therein, and that a copy of the Court's Order has been provided to each and every person employed by Defendant at The Bellevue and to each management level employee with responsibility for the operation of the salon at The Bellevue including Briar Van Metter, Snow Proudlove, Megan Stern, Jocelyn Horst, Blair Hodgson, Brian Luborsky, Paul Bernards and Michael Kirkpatrick.

## A. Preliminary Injunction Standard

"The test for preliminary relief is a familiar one. A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).

Preliminary injunctions are extraordinary relief that should be granted only in limited circumstances. Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994). "A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered." Acierno v. New Castle County, 40 F.3d 645, 647 (3d Cir. 1994). "Status quo" refers to "the last, peaceable, noncontested status of the parties." Kos Pharm., 369 F.3d at 708.

**B. Claims for Relief**

Plaintiff requests preliminary injunctive relief based on its claims for (1) conversion, (2) violations of the Lanham Act, and (3) intentional interference with present and prospective business and contractual relations. I apply the traditional test for preliminary relief with respect to each of these claims.

1.     Conversion

Pierre & Carlo claims that Premier converted two categories of property: (1) Pierre & Carlo's furniture, fixtures, and equipment and (2) Pierre & Carlo's customer lists. To prevent irreparable harm accruing from these alleged violations, Pierre & Carlo requests that I order Defendant to stop using all furniture, fixtures, and equipment present in the salon on October 23, 2009 and to surrender all information relating to customers who patronized Pierre & Carlo prior to October 23, 2009.

> A.    *Furniture, Fixtures, and Equipment*
>
> i.    Likelihood of Success on the Merits

Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc., 777 A.2d 1090, 1095 (Pa. Super. Ct. 2001). A claim for conversion may succeed even where the defendant purchased the property in good faith: "a good faith purchaser of the goods from the converter is also a converter and must answer in damages to the true owner." Underhill Coal Mining Co. v. Hixon, 652 A.2d 343, 345 (Pa. Super. Ct. 1994). See also L.B. Foster, 777 A.2d at 1093 ("one

who purchases goods from a thief obtains no right to the property, as against the claims of the true owner, even if he is a good faith purchaser for value").

The lease agreement between Pierre & Carlo and The Bellevue clearly provides that the furniture, fixtures, and equipment in the Premises belong to Pierre & Carlo:

> Any trade fixtures including, but not limited to, signs, display counters, shelving, display cases, mirrors, track lighting, chandeliers and the like, free standing lamps, and other furnishings and fixtures that can be removed without causing material damage to the Premises and other personal property of Tenant not permanently affixed to the Premises shall remain the property of Tenant.

(Ex. C at 34.)  Premier claims that it is not liable for conversion because The Bellevue covenanted that "all existing furniture, fixtures, and equipment will remain in place and become the property of [Premier]."  (Ex. J.)  The Bellevue's covenant, however, is immaterial because The Bellevue itself lacked title to the chattel under its lease with Pierre & Carlo.

Pierre & Carlo has provided uncontroverted evidence that, prior to October 23, 2009, it had title to or was the rightful lessee of the personal property at issue.   Nothing that happened on or after October 23 changed that.[14]  Because Pierre & Carlo has title to the property and Premier

---

[14] Premier argues that The Bellevue gained title to the chattel through a self-help provision in the lease between Pierre & Carlo and The Bellevue.  Although the lease does contain a self-help provision, that provision is irrelevant to the current dispute because it only allows The Bellevue to possess the Premises and fails to grant The Bellevue any ownership rights with respect to personal property held within the Premises. (See Ex. C at 37-39.)  Recognizing this, The Bellevue's judgment of possession against Pierre & Carlo in the Court of Common Pleas of Philadelphia County applies only to the Premises themselves; it is entirely silent as to any personal property held within the Premises.  (See Pl.'s Feb. 19, 2010 Findings of Fact, Doc. # 34, Ex. 3.)  Moreover, even The Bellevue's right to possess the Premises pursuant to the self-help provision is in doubt:  on April 16, 2010, the Court of Common Pleas opened the judgment of possession.  (Apr. 21, 2010 Mot. to Supplement Prelim. Inj. R., Doc. # 50.)

does not, Pierre & Carlo has established a likelihood of success on its conversion claim with respect to the furniture, fixtures, and equipment.

ii.        Balance of Equities and Public Interest

To protect itself from Premier's improper use of its furniture, fixtures, and equipment, Pierre & Carlo asks that I order Premier to cease and desist from using any and all furniture, fixtures, and equipment present in the salon on October 23, 2009. After establishing a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must show that it will suffer irreparable harm if the injunction is denied, that granting preliminary relief will not result in even greater harm to the nonmoving party, and that the public interest favors relief. Kos Pharm., 369 F.3d at 708.

An irreparable harm is a "harm which cannot be redressed by a legal or an equitable remedy following a trial. Economic loss does not constitute irreparable harm." Acierno, 40 F.3d at 653 (citations and quotations omitted). "[L]oss of control of reputation, loss of trade, and loss of good will" do, however, constitute irreparable harm. Kos Pharm., 369 F.3d at 726 (quotation and citation omitted).

Pierre & Carlo has established that it will suffer an irreparable loss of trade if Premier's improper use continues. As Cutrufello testified, and I found credible, Pierre & Carlo is unable to open a Pierre & Carlo salon in a new location without this equipment. (TR20 at 110-11.) I also found Cutrufello credible when he testified that, if the equipment were returned to him, he would use it to open a new salon and spa. (TR20 at 277-81.) Because of the value of the Pierre & Carlo brand and the availability of potential business partners, Pierre & Carlo would likely succeed in opening a new salon in a different location. (See TR20 at 120-24, 153-54.) Returning

12

the equipment would thus help Pierre & Carlo return to the status quo – that is, the last peaceable, noncontested status of the parties – in order to prevent a continuing loss of trade and reputation during the pendency of this action.  See Kos Pharm., 369 F.3d at 708.

Granting this relief would impose little, if any, harm on Premier.  At worst, Premier would be required to purchase new equipment.  Because of Premier's solvency, however, this is a mere financial harm, rather than an irreparable one.  "District courts should consider financial damages when establishing and setting the bond for an injunction, not when deciding whether to grant it."  Id., 369 F.3d at 728.  Thus, any potential harm to Premier from relinquishing the equipment can be adequately resolved through a sufficient bond.  Moreover, "the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor."  Id. at 729.  Because the record is clear that Pierre & Carlo has title to the property and the law is clear that a good faith purchaser from a converter remains liable for conversion, Pierre & Carlo is extremely likely to succeed on this claim.  Finally, the public interest favors this relief in order to allow Pierre & Carlo to continue operations, service customers, and hire employees.  Thus, I will grant this request for injunctive relief.

      B.    *Customer Lists*

      i.    Likelihood of Success on the Merits

Pierre & Carlo has also established a likelihood of success on the merits with respect to its claim for conversion of the customer lists.  Pennsylvania recognizes a claim for conversion of business information in accordance with the Restatement of Torts § 759.  "To state a claim for conversion of business information, a party must allege acquisition of confidential business information through misconduct."  Bancorp Bank. v. Isaacs, No. 07-1907, 2010 WL 1141336, at

*8 (E.D. Pa. Mar. 25, 2010) ("[C]ustomer information is confidential information").  See also Pestco, Inc. v. Assoc. Prod., Inc., 880 A.2d 700, 708-09 (Pa. Super. Ct. 2005).  Confidential information includes "information about one's business whether or not it constitutes a trade secret."  Restatement of Torts § 759 cmt. b.  Misconduct includes "inducing employees or others to reveal the information in breach of duty" and "fraudulent misrepresentations."  Id. at § 759 cmt. c.

Premier clearly acquired and used Pierre & Carlo's customer lists when its employees made phone calls and sent mailings to Pierre & Carlo customers.  Further, Pierre & Carlo has established a likelihood that it considered its customer lists confidential business information.  Cutrufello testified that it took years of working with his staff to develop Pierre & Carlo's clientele.  (TR20 at 124.)  In addition, Pierre & Carlo's Policies and Procedures Manual states that customer lists belong to Pierre & Carlo:

> Salon records such as perm cards, color cards, names, addresses, and phone numbers of clients are the property of Pierre and Carlo, Inc.  Any such records are for salon use and for performance of such services.  These records are not to be removed from the salon.

(TR20 at 270-71.)  Premier argues that Pierre & Carlo did not consider the customer lists confidential because, on previous occasions, Cutrufello allowed operators who left the salon to take a copy of the customer lists with them.  (TR20 at 125, 212-13.)  While Pierre & Carlo might have been willing to share its confidential customer information with some prior employees, that cannot support a finding that it would be willing to share confidential business information with a competitor.

Pierre & Carlo has also demonstrated a likelihood that it can establish that Premier acquired the customer lists through misconduct. Although Premier may have lacked knowledge about Pierre & Carlo's specific policies, Premier was likely aware that customer lists are considered confidential business information. Indeed, Premier's own policies prohibit employees from sharing customer information. (See Ex. Y.) Thus, Premier converted the customer lists when it induced Pierre & Carlo employees to reveal them in breach of their duty to Pierre & Carlo.

ii.        Balance of Equities and Public Interest

Pierre & Carlo asks that I order Premier to surrender all information relating to customers who patronized Pierre & Carlo on and prior to October 23, 2009. Pierre & Carlo has failed, however, to establish an irreparable harm from Premier's continued use of the customer lists. In fact, Cutrufello testified that he had no objection to Premier operators calling or servicing Pierre & Carlo customers. (TR20 at 234.) I decline to enjoin unobjectionable activity.

2.      <u>Lanham Act</u>

       *A.*      *Likelihood of Success on the Merits*

Pierre & Carlo has also established a likelihood of success on its Lanham Act claim. The Lanham Act provides for civil liability when a defendant:

> [U]ses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

15

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C.A. § 1125(a).  Generally, to establish a likelihood of success on a Lanham Act claim, a plaintiff must show:  (1) the marks are valid and legally protectable, (2) the marks are owned by the plaintiff, and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services.  Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990).  It is undisputed that the "Pierre & Carlo" name is valid, legally protectable, and owned by Pierre & Carlo.

Pierre & Carlo alleges two types of violations of the Lanham Act.  The first alleged violation is based on Premier's use of signage, receipts, and products bearing the Pierre & Carlo name.  On November 10, 2009, Premier agreed to discontinue using the Pierre & Carlo name in this fashion, and it is unnecessary to further discuss such use here.

The second alleged violation is based on Premier's use of the name Pierre & Carlo in two promotional mailings that were distributed to former Pierre & Carlo customers in November 2009.  The first mailing, after stating that Premier "Occupies the Space and Retains the Staff of Pierre & Carlo Salon and Spa," goes on to explain:

Halcyon Days Salon & Spa opened for business on October 23 in the space previously known as Pierre & Carlo Salon and Spa, to carry on the legacy of one of Philadelphia's top beauty destinations.  Guests can expect the same great service and staff, while experiencing a renewed commitment to quality and luxury with support from the location's new operator.

. . .

With Pierre & Carlo's 30-year history at The Bellevue, and a clientele that includes government and business dignitaries, high-society brides and celebrities,

becoming a part of the Halcyon Days network will take this formerly family-run business to the next level.

(Ex. AA.)  The second mailing, sent on November 20, 2009, contains some of the same language:

> Halcyon Days Salon & Spa opened for business on October 23, 2009 in the space previously known as Pierre & Carlo Salon and Spa, to carry on the legacy of one of Philadelphia's top beauty destinations.  Guests can expect the same great service and staff, while experiencing a renewed commitment to quality and luxury with support from the location's new operator.

(Ex. FF.)

Pierre & Carlo contends that these mailings violate the Lanham Act because they use Pierre & Carlo's name in a manner that is likely to confuse customers.  Premier responds that its use of the Pierre & Carlo name in these mailings is protected because it is merely descriptive.

Nonowners of a mark are sometimes allowed to use the mark in a descriptive manner, in what is termed a "nominative fair use."  For example, a mechanic may use the term "Volkswagen" to describe the type of cars that he repairs.  See Volkswagenwerg Aktiengesellschaft v. Church, 411 F.2d 350 (9th Cir. 1969).  Not all descriptive uses, however, are protected.  As in more traditional infringement cases, the primary inquiry is whether the defendant's use of the mark is likely to cause confusion.  Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 222 (3d Cir. 2005).  If the plaintiff succeeds in establishing a likelihood of confusion, "the burden then shifts to defendant to show that its nominative use of plaintiff's mark is nonetheless fair."  Id.

Courts generally consider ten factors in evaluating the likelihood of confusion in trademark infringement cases.  See Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir.

1983).[15]  Because some of these factors are uninformative in nominative fair use cases, the Third

Circuit has suggested that courts focus on four key factors:

> (1)  The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> (2)  The length of time the defendant has used the mark without evidence of actual confusion;
>
> (3)  The intent of the defendant in adopting the mark; and
>
> (4)  The evidence of actual confusion.

Century 21, 425 F.3d at 225-26.  I also consider the similarity of the businesses and other facts

suggesting that the consuming public might expect the prior owner to provide both services.  Kos

Pharm., 369 F.3d at 709.  "None of these factors is determinative in the likelihood of confusion

---

[15] Those factors are:

> 1.  The degree of similarity between the owner's mark and the alleged infringing mark;
>
> 2.  The strength of the owner's mark;
>
> 3.  The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> 4.  The length of time the defendant has used the mark without evidence of actual confusion arising;
>
> 5.  The intent of the defendant in adopting the mark;
>
> 6.  The evidence of actual confusion;
>
> 7.  Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
>
> 8.  The extent to which the targets of the parties' sales efforts are the same;
>
> 9.  The relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;
>
> 10.  Other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

Kos Pharm., 369 F.3d at 709.

analysis and each factor must be weighed and balanced one against the other." Checkpoint Sys., Inc. v. Check Point Software Tech., Inc., 269 F.3d 270, 280 (3d Cir. 2001).

Premier offers exactly the same services as Pierre & Carlo, uses the same employees, operates in the same location, and seeks to attract the same customers; the only notable difference between the two entities is their name, so if one were to use the other's name, it is only natural that customers would be confused. Moreover, the letters themselves are misleading. When Premier wrote that "[w]ith Pierre & Carlo's 30-year history at The Bellevue . . . becoming a part of the Halcyon Days network will take this formerly family-run business to the next level," it implied that Pierre & Carlo was becoming a part of the Halcyon network. The opposite is true: there is no relationship between Pierre & Carlo and Halcyon. Similarly, when the letters state that Halcyon will "carry on the legacy" of Pierre & Carlo, it implies a relationship between the two businesses where none exists, allowing Premier to improperly capitalize on Pierre & Carlo's reputation and good will within the community.

A consideration of the Century 21 factors also suggests a likelihood of confusion. First, I consider the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase. "When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion." Checkpoint, 269 F.3d at 284. "Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of the product, the more care that must be exercised in its selection." Versa Prods. Co. v. Bifold Co., 50 F.3d 189, 204 (3d Cir. 1995). Because neither party provided evidence regarding the degree of care consumers use when purchasing salon and spa services, this factor is neutral.

Second, I consider the length of time that Premier used the mark and evidence of actual confusion. Although there has been little evidence of confusion to date, that is primarily because of the short period of time during which Premier has been using the mark and because of the early stage in the proceedings.[16] Nonetheless, the evidence at this stage suggests that customers questioned what happened to Pierre & Carlo. (TR19 at 78-80.) Premier employees fostered confusion by telling those customers that Pierre & Carlo had "become" Halcyon. (TR19 at 79.) It is likely that the Premier mailings further confused those customers by suggesting a relationship between Pierre & Carlo and Halcyon.

Finally, I consider Premier's intent in adopting the mark. Plaintiff has established a likelihood that Premier wrote the letters in an attempt to capitalize on Pierre & Carlo's reputation by deliberately misleading customers and implying that there is a relationship between the salons. Evidence that Premier employees called Pierre & Carlo customers saying that they are "from Pierre & Carlo," attempted to obtain Pierre & Carlo's phone number, and honored Pierre & Carlo gift cards also show that Premier intended to mislead customers.

Because I find that Pierre & Carlo has established a likelihood of confusion, the burden shifts to the "defendant to show that its nominative use of plaintiff's mark is nonetheless fair." Century 21, 425 F.3d at 222. To demonstrate fairness, a defendant must show:

> (1)     that the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service;

---

[16] Decisions regarding preliminary injunctions are generally "based on an abbreviated set of facts" that require a "delicate balancing." Am. Tel. & Tel. Co., 42 F.3d at 1427. Although no customers that received the mailings testified at the preliminary injunction hearing, I believe that, with ample time for discovery, Pierre & Carlo would likely uncover evidence of actual confusion.

(2)     that the defendant uses only so much of the plaintiff's mark as is necessary
        to describe plaintiff's product; and

(3)     that the defendant's conduct or language reflect the true and accurate
        relationship between plaintiff and defendant's products or services.

Id.

Premier cannot demonstrate fairness.  It is completely unnecessary for Premier to use

Pierre & Carlo's mark to describe its product or service; Premier could simply identify itself as a

"world class salon and spa that operates in The Bellevue."  Additionally, Premier's conduct and

language fail to reflect the true and accurate relationship between the salons' services.

         B.     *Balance of Equities and Public Interest*

                       i.      Enjoining Use of the Pierre & Carlo Name

         On November 12, 2009, I enjoined Premier "from using the name 'Pierre & Carlo' or any

derivation thereof."  Although both Pierre & Carlo and Premier agree that this order remains in

effect, they disagree about its scope.  Pierre & Carlo argues that Premier must be enjoined from

all uses of the Pierre & Carlo name, such as those in the November mailings, that confuse

customers.

         I find that Pierre & Carlo has established a likelihood of success on the merits of its

Lanham Act claim with respect to the November mailings.  "[O]nce the likelihood of confusion

caused by trademark infringement has been established, the inescapable conclusion is that there

was also irreparable injury."  Pappan Enter. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d

Cir. 1998); Kos Pharm., 369 F.3d at 726 ("Lack of control over ones mark creates the potential

for damage to reputation, which constitutes irreparable injury for the purpose of granting a

preliminary injunction in a trademark case.  Thus, trademark infringement amounts to irreparable

injury as a matter of law.") (citations and quotations omitted).  If confusing uses of the Pierre &

Carlo name continue, Pierre & Carlo will suffer irreparable injury to its reputation and good will

in the community.  This damage limits Pierre & Carlo's ability to obtain licensing fees for the use

of its name and interferes with Pierre & Carlo's ability to open a new salon or partner with an

existing salon.

     In contrast, Premier suffers no injury from this injunction.  Moreover, prohibiting use of

the Pierre & Carlo name serves the public "interest in prevention of confusion, particularly as it

affects the public interest in truth and accuracy."  Kos Pharm., 369 F.3d at 730.  Thus, I will

clarify that my November 12, 2009 order extends to the limits of the Lanham Act.

         ii.     Notifying Pierre & Carlo Customers that the November Mailings
                Contain False Statements

     In order to prevent irreparable harm from Premier's confusing uses of Pierre & Carlo's

name, Pierre & Carlo requests that I order Defendants to:

> [I]mmediately notify in writing all customers of Pierre & Carlo prior to October
> 23, 2009, that the statements made in the letters mailed on or about November 20,
> 2009 are false and fraudulent and that there has never been any legitimate
> association between Pierre & Carlo and Halcyon Days Salon & Spa.

This relief will help preserve the status quo and prevent irreparable harm.  Specifically, such a

letter would prevent further harm to Pierre & Carlo's reputation by clarifying that Pierre & Carlo

did not "become" Premier and that there is no affiliation between Pierre & Carlo and Premier.

     Premier will suffer no harm from the minimal financial cost associated with such a

mailing.  Although Premier could potentially suffer harm to its reputation if ordered to tell

potential customers that it sent a letter with "false and fraudulent" statements, this harm can be

prevented by instead requiring Premier to notify recipients of the November 2009 mailings that

there is no relationship between Premier (or Halcyon) and Pierre & Carlo and that they are two entirely separate business entities.  Because I will allow Premier to draft the initial version of this letter, subject to Pierre & Carlo's objections and Court approval, any harm to Premier will be minimized.  This option also serves the public interest by mitigating confusion about the relationship between Premier and Pierre & Carlo.

     3.     Intentional Interference with Present and Prospective Business and Contractual Relations

Under Pennsylvania law, to succeed on a claim for tortious interference with existing or prospective business relationships, a party must show:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

Acumed L.L.C. v. Advanced Surgical Serv., Inc., 561 F.3d 199, 212 (3d Cir. 2009).  Pierre & Carlo alleges that Premier intentionally interfered with three business relationships:  (1) Pierre & Carlo's relationship with the State Board of Cosmetology, (2) Pierre & Carlo's relationship with its customers, and (3) Pierre & Carlo's relationship with its employees.

     *A.*     *State Board of Cosmetology*

     i.     Likelihood of Success on the Merits

Pierre & Carlo's claim of tortious interference with its relationship with the State Board of Cosmetology fails because Pierre & Carlo has failed to establish that it had a "contractual or economic relationship" with the State Board.

Although the Pennsylvania Supreme Court has not addressed this exact issue, Pennsylvania has generally followed the Restatement (Second) of Torts in this area. <u>See, e.g.,</u> <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia</u>, 898 F.2d 914, 925 (3d Cir. 1990). The Restatement explains that this tort covers only relations of pecuniary value: interference with employment relationships, buying or selling goods or services, or other "potentially profitable" relationships. "[I]nterference with personal, social and political relations is not covered." Restatement (Second) of Torts § 766B cmt. c.

Pierre & Carlo lacked a "business" or "economic" relationship with the State Board. Tortious interference is a "business-centered tort" that cannot be established by alleging interference with the relationship between a business and its government regulator. <u>See</u> <u>Carlson v. Roetzel & Andress</u>, No. 07-33, 2008 WL 873647, at *14 (D.N.D. Mar. 27, 2008) (finding no business relationship between a workers compensation claimant and the state agency responsible for regulating the workers compensation scheme).[17]

> ii.    Balance of Equities and Public Interest

Because Pierre & Carlo has failed to establish a likelihood of success on the merits for its claim of tortious interference with its business relationship with the State Board, I will deny the injunctive relief associated with that claim.

---

[17] To succeed on a claim of tortious interference with business under North Dakota law, a plaintiff must establish essentially the same elements that are required under Pennsylvania law. <u>See</u> <u>Trade 'N Post, L.L.C. v. World Duty Free Am., Inc.</u>, 628 N.W.2d 707 (N.D. 2001).

### B. Customers

#### i. Likelihood of Success on the Merits

_____Pierre & Carlo has established a likelihood of success on the merits with respect to its claim for tortious interference with its business relationships with its customers. First, Pierre & Carlo clearly had business relationships with its customers, many of whom had repeatedly visited the salon over the course of many years.

Second, Premier took purposeful action specifically intended to harm this relationship. Premier misrepresented its true identity by displaying Pierre & Carlo signage, answering the phone with Pierre & Carlo's name, and selling Pierre & Carlo branded product. Premier also attempted to imply that there was a relationship between Premier and Pierre & Carlo through its efforts to obtain the Pierre & Carlo phone number. Finally, Premier engaged in advertising specifically targeted at Pierre & Carlo customers and interfered with Pierre & Carlo's ability to service those customers.

Third, Premier was not legally entitled to act in this manner. Although "competitors, in certain circumstances, are privileged in the course of competition to interfere with others' prospective contractual relationships," they may not do so by using "wrongful means." Acumed, 561 F.3d at 215. Conduct is wrongful where it is "actionable for a reason independent from the claim of tortious interference itself." Id. Here, Premier's wrongful actions included, at the very least, likely violations of the Lanham Act and conversion.

_____Fourth, Pierre & Carlo has established legal damage to its business as a result of the loss of these customers. This damage is ongoing as former Pierre & Carlo customers continue to visit Premier while Pierre & Carlo is unable to reopen its business.

In order to prevent alleged irreparable harm from Premier's interference with its business relations, Pierre & Carlo asks that I enjoin Premier from servicing customers who patronized Pierre & Carlo on and prior to October 23, 2009.  As previously discussed, however, Pierre & Carlo has no current objection to Premier operators servicing Pierre & Carlo customers.  Thus, I will decline to impose this category of injunctive relief.

C.    *Employees*

i.    Likelihood of Success on the Merits

Pierre & Carlo has also established a likelihood of success on its claim of tortious interference with its business relations with its employees.

It is undisputed that Pierre & Carlo had a business relationship with its employees.  It is similarly clear that Premier interfered with that relationship by hiring Pierre & Carlo employees and that Pierre & Carlo suffered legal damage as a result of Premier's actions.

Pierre & Carlo's success on this claim, therefore, turns on whether Premier acted with "privilege" or "justification."  Although businesses are generally justified in hiring a competitor's employees, they are prohibited from doing so when the inducement is made for wrongful purposes:

> Offering employment to another company's at-will employee is not actionable in and of itself.  However, systematically inducing employees to leave their present employment is actionable when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employees.  Further, when the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection.

Reading Radio, Inc. v. Fink, 833 A.2d 199, 212 (Pa. Super. Ct. 2003) (internal citations and quotations omitted). The facts at this stage demonstrate that Premier acted specifically to "entic[e] away [Pierre & Carlo's] customers." Id.

Premier never claimed that it hired Pierre & Carlo's employees "to obtain the services of particularly gifted or skilled employees," id., and there is no evidence that Premier had any information about which specific Pierre & Carlo employees were particularly gifted or skilled. Instead, it is likely that Premier's intent in hiring the employees was to acquire Pierre & Carlo's confidential customer information and to give the misleading impression that Premier was continuing Pierre & Carlo's business (rather than simply operating a new salon and spa in Pierre & Carlo's old location). To that end, Premier "dangled" the prospect of an employment position in front of Cutrufello to garner his assistance in encouraging Pierre & Carlo employees to work for Premier. Premier then induced the former Pierre & Carlo employees to use Pierre & Carlo's confidential client information and call Pierre & Carlo customers. These facts, especially when combined with evidence that Premier used Pierre & Carlo's name, products, equipment, reservations, and gift cards, and attempted to use the Pierre & Carlo phone number, suggest that Premier's interest in hiring these employees was to usurp Pierre & Carlo's business, rather than to hire gifted and skilled employees.

ii.     Balance of Equities and Public Interest

To protect irreparable harm arising from Premier's tortious interference with Pierre & Carlo's relationship with its employees, Pierre & Carlo asks that I excuse former Pierre & Carlo employees from their employment agreements with Premier. Pierre & Carlo has failed to establish, however, that this relief will actually prevent an irreparable injury.

27

Even if Pierre & Carlo were to open another salon and spa in a different location, there is no evidence that its former employees would choose to forego their relationships with Premier to accept a position with Pierre & Carlo.  To the contrary, former Pierre & Carlo employees testified that, prior to the Premier takeover, they were concerned about Pierre & Carlo's financial health and that there were times when Pierre & Carlo was unable to make payroll.  (TR19 at 93-94, 131-32.)  The employees also testified that overall conditions and the quality of services are better at Premier than they were at Pierre & Carlo.  (TR19 at 133-34.)

Because there is no evidence that imposing this relief will protect Pierre & Carlo from further harm, I decline to release former Pierre & Carlo employees from their employment agreements with Premier.

4.	General Requests for Relief

_____In addition to the relief discussed above, Pierre & Carlo also seeks two forms of injunctive relief that are generally supported by all of its claims.  Specifically, Pierre & Carlo asks:  (1) that I order Premier to cease all operations within The Bellevue and (2) that I require defense counsel to certify compliance with my order.

A.	*Cease Operations in The Bellevue*

Pierre & Carlo has failed to demonstrate an irreparable injury that can be prevented by granting this relief.  Even if I were to preclude Premier from operating a salon within The Bellevue, there is no evidence suggesting that The Bellevue, a non-party in this action, would invite Pierre & Carlo to reopen its salon in that location.  Thus, I will deny this request for injunctive relief.

*B.      Defense Counsel Shall Certify Compliance with the Court's Order*

In light of testimony that Premier's employees were uninformed about the order enjoining use of the Pierre & Carlo name, that Premier employees were unaware of their document preservation obligations, and because this request imposes only a minimal burden on Premier, I will grant this relief as stated in the accompanying order.

## C.  Security

Federal Rule of Civil Procedure 65(c) allows a court to issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  Indeed, it is generally "reversible error when [a district court] fails to require the posting of a bond by the successful applicant for a preliminary injunction."  Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 803-04 (3d Cir. 1989).  Nonetheless, some courts have held that the bond requirement may be waived under limited circumstances, such as when the plaintiff is financially unable to post it and where the defendant is unlikely to face financial harm.  Temple Univ. v. White, 941 F.2d 201, 219-20 & n.26 (3d Cir. 1991).  See also Frank's GMC Truck Center, Inc. v. Gen. Motors Corp., 847 F.2d 100, 103 (3d Cir. 1988) ("While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory.  We have held previously that absent circumstances where there is no risk of monetary loss to the defendant, the failure of a district court to require a successful applicant to post a bond constitutes reversible error.").

In order to comply with Rule 65(c), the injunctive relief discussed in this Memorandum will become effective only after an appropriate bond is in place.[18]

## III. CONCLUSION

For the reasons explained above, I will grant Pierre & Carlo's motion for a preliminary injunction by: (1) continuing to restrain and enjoin Premier from using the name "Pierre & Carlo" or any derivation thereof, (2) ordering Defendant to cease and desist from using any and all furniture, fixture, and equipment present in the salon on October 23, 2009, and (3) ordering Defendant to explain to former Pierre & Carlo customers that Halcyon is unaffiliated with Pierre & Carlo. This relief will become effective after an appropriate bond is in place. The parties shall submit a recommendation accompanied by a justification for the amount of the bond by June 2, 2010.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to:

---

[18] The November 12, 2009 order restraining Premier "from using the name 'Pierre & Carlo' or any derivation thereof" remains in effect, as clarified by this Memorandum.